



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

*Derek Hines*
*Assistant United States Attorney*
*derek.hines@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4817*
*MAIN: 410-209-4800*

February 4, 2020

Jerry Tarud, Esq.
200 E. Lexington St.
Suite 1200
Baltimore, Maryland 21202
Email: jtlawesq@aol.com

Re:   United States v. Lance Andre Lucas

*CCB-20-054*

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Lance Andre Lucas (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by February 14, 2020, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offenses of Conviction

1.      The Defendant agrees to waive indictment and plead guilty to Counts 1 and 2 of an Information, which charges the Defendant with Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346, and the Use of an Interstate Facility to Carry On Unlawful Activity (also known as the "Travel Act"), in violation of 18 U.S.C. § 1952. The Defendant admits that the Defendant is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offenses

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

   a.      **Count One – Honest Services Wire Fraud.** That on or about the dates charged in the Information, in the District of Maryland and elsewhere:

      1. First, that there was a scheme or artifice to defraud or to obtain the intangible right of honest services by materially false and fraudulent pretenses, representations or promises, as alleged in the Information;

1

    2. Second, that the Defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

    3. Third, that in execution of that scheme, the Defendant used or caused the use of the interstate wires for the purpose of executing the scheme as specified in the Information.

b.    **Count Two – Travel Act.** That on or about the dates charged in the Information, in the District of Maryland and elsewhere:

    1. The Defendant used and caused the use of an interstate facility;

    2. The use of the interstate facility was done with the intent to promote, manage, establish, or carry on or distribute the proceeds of an unlawful activity, to wit, state bribery in violation of Section 9-201(b) ("Bribing Public Employee"), Md. Crim. Law (formerly Art. 27, Section 22); and

    3. After the use of the interstate facility, the Defendant performed or attempted to perform an act in furtherance of this same unlawful activity.

## Penalties

3.    The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| COUNT | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. §§ 1343, 1346 | None | 20 years | Not more than 5 years | $250,000 | $100 |
| 2 | 18 U.S.C. § 1952 | None | 5 years | Not more than 3 years | $250,000 | $100 |

    a.    Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

    b.    Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

c.     Collection of Debts: If the Court imposes a fine, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4.     The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.     If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.     If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.     The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

3

e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the applicable guideline calculation is as follows:

4

| | | |
|---|---|---|
| a. Base offense level (U.S.S.G. § 2C1.1(a)(2)) | | 12 |
| b. More than one bribe (U.S.S.G. § 2C1.1(b)(1)) | | +2 |
| c. Value of the bribe (U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(C)) | | +6 |
| d. Elected public official (U.S.S.G. § 2C1.1(b)(3)) | | +4 |

TOTAL    24

This Office does not oppose a two-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's acceptance of personal responsibility for the Defendant's conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. The parties anticipate that the Defendant's criminal history is a category I.

8.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

9.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office reserves the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office deems relevant to sentencing, including the conduct that is the subject of any counts of the Information. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

Waiver of Appeal

10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

5

a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s) to the extent such challenges legally can be waived.

b.      The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: the Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Defendant's Conduct Prior to Sentencing and Breach

11.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement.

6

### Court Not a Party

12.   The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

13.   This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

*[Remainder of page intentionally blank]*

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

By: _____
Derek E. Hines
Leo J. Wise
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

2/11/20
Date

Lance Andre Lucas
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

2/11/20
Date

Jerry Tarud, Esq.
Counsel for Defendant

8

**ATTACHMENT A**

**STIPULATION OF FACTS**

*The Defendant, Lance Andre Lucas, stipulates and agrees that if this case had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. The Defendant stipulates and agrees that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

## Background

At all relevant times, the Defendant, Lance Andre Lucas ("LUCAS") was an entrepreneur and businessman. He was employed by Company 1 and formed Non-Profit 1. Company 1 developed the Cyber Warrior Diversity Program curriculum to sell to institutions offering education and training to persons interested in cyber security professions. Non-Profit 1 was formed for the purpose of providing community internet networks and computer instruction for children and adults. Additionally, LUCAS partnered with other individuals who were involved in businesses engaged in distributing or growing medical marijuana, including Company 2 and Company 3. Company 2 sought a medical marijuana dispensary license, was awarded Stage One license pre-approval by the Natalie M. LaPrade Maryland Medical Cannabis Commission (hereafter the "Cannabis Commission" or "Commission"), and sought final approval from the Cannabis Commission. Company 3 applied for a medical marijuana growing license in May 2019.

Cheryl Diane Glenn was a Delegate in the Maryland House of Delegates ("House"), representing District 45, which covered portions of Baltimore, Maryland. The State of Maryland and its citizens had an intangible right to the honest services of its elected officials and Delegate Glenn owed the State of Maryland and its citizens a fiduciary duty to, among other things, refrain from soliciting and receiving bribes in exchange for taking, or agreeing to take, official actions.

Delegate 1 is an unnamed, fictitious member of the Rules Committee in the House. Cannabis Commission Employee 1 is an unnamed, fictitious employee of the Cannabis Commission.

## Maryland Medical Marijuana Cannabis Commission

Since 2013, the General Assembly of Maryland has enacted legislation that resulted in the award of licenses permitting companies to grow, process, and dispense medical marijuana. Delegate Glenn was actively involved in sponsoring such legislation and in securing its passage. For example, Delegate Glenn was a sponsor of House Bill 1101, passed by the state legislature and signed into law by the Governor in 2013, which authorized access to medical marijuana in the State of Maryland for qualifying individuals and established the Cannabis Commission. The Cannabis Commission was responsible for developing policies, procedures, and regulations to implement programs regarding the distribution of medical marijuana. The Cannabis Commission oversaw all licensing, registration, inspection, and testing measures pertaining to Maryland's medical cannabis program and provided relevant program information to patients, physicians, growers, dispensers, processors, testing laboratories and caregivers. The Cannabis Commission

enacted a "double-blind" review process for licensing applications in which the Cannabis Commission's reviewers were not supposed to know whose applications they were assessing because the names of owners and businesses were redacted, and applicants were not supposed to know who was reviewing their application.

_Cyber Warrior Diversity Program_

House Bill 1819, titled "Higher Education – Cyber Warrior Diversity Program – Established" created the Cyber Warrior Diversity Program at several higher education institutions in Maryland. The purpose of the program was to create opportunities to train students in computer networking and cybersecurity. House Bill 1819 passed the House by a vote of 133-2, with Delegate Glenn voting in favor, on April 6, 2018, passed the Senate by a vote of 45-0 on April 9, 2018, and was approved by the Governor on May 8, 2018.

Senate Bill 432 and cross-filed House Bill 1315, which was introduced by Delegate Glenn, were titled "Higher Education – Cyber Warrior Diversity Program – Revisions." Senate Bill 432 and House Bill 1315 created a mandated fiscal appropriation of $2.5 million dollars in the annual state operating budget for grants to several higher education institutions which implemented the Cyber Warrior Diversity Program. The initial draft of the bill included a provision requiring the award of contracts to certain businesses that met specified criteria. Company 1 met the criteria specified in the initial draft of the bill. Senate Bill 432 was introduced and read for the first time on February 1, 2019. House Bill 1315 was introduced and read for the first time on February 15, 2019. Senate Bill 432 passed the Senate by a vote of 46-0 on March 7, 2019, and passed the House with amendments by a vote of 137-0 on April 3, 2019, with Glenn voting in favor. The bill was amended to remove the provision requiring the award of contracts to only certain businesses that met specified criteria. The Senate concurred with the House amendments on April 4, 2019, and passed Senate Bill 432 on its third reading by a vote of 45-0. Senate Bill 432 was approved by the Governor on May 13, 2019.

_The First Payment - $2,000_

On May 22, 2018, LUCAS was introduced to Delegate Glenn at a lunch meeting in a room above a car dealership in Baltimore, Maryland. LUCAS told Delegate Glenn that Company 2 had incurred significant costs in its pursuit of a medical marijuana dispensary license. Delegate Glenn responded, "if you had given me that money, I would have written you into the bill . . ." or words to that effect, meaning that Delegate Glenn would have drafted a house bill to provide for the award of a license to Company 2 if LUCAS had paid her the costs he incurred to pursue the license. LUCAS subsequently provided Delegate Glenn with four money orders, each for $500. Per her instructions, LUCAS and Delegate Glenn agreed that LUCAS would not make the money orders payable to her campaign account, and Delegate Glenn did not deposit them into her campaign account. LUCAS also agreed to arrange a campaign fundraiser for Delegate Glenn on June 14, 2018, at a hotel in Baltimore, Maryland.

Delegate Glenn agreed to arrange a meeting between Delegate Glenn, LUCAS, other representatives from Company 2, and the Chairman of the Cannabis Commission. The meeting

10

with the Chairman of the Cannabis Commission occurred on or about August 27, 2018. After the meeting, Delegate Glenn and LUCAS exchanged the following text messages:

LUCAS:    Thank you for coming today! I appreciate you

Glenn:     The meeting was great!! I'm fundraising again. Campaign account is at zero because of the challenging Primary.  Need to talk to you re help needed. Thanks.

LUCAS:    My help guaranteed

### The Second Payment - $1,000

On September 19, 2018, Delegate Glenn sent LUCAS a text message asking him where she could meet him at 4:00 pm.  Delegate Glenn and LUCAS agreed to meet in the Little Italy neighborhood in Baltimore, Maryland.  LUCAS provided Delegate Glenn with $1,000 in cash. Delegate Glenn did not deposit this money into her campaign account.

### The Third Payment – $1,500

On October 22, 2018, Delegate Glenn and LUCAS met outside of a residence in Baltimore County, Maryland.  LUCAS provided Delegate Glenn with a bank check for $1,500 written to "Cheryl Glenn," and not to her campaign account.  Delegate Glenn did not deposit this money into her campaign account.

### The Fourth Payment - $1,500

On or about February 8, 2019, LUCAS met Delegate Glenn in her office and asked her to cross-file a bill in the House related to Senate Bill 432.  LUCAS told Delegate Glenn that he believed Senate Bill 432 would have a greater chance at passage if Delegate Glenn cross-filed the bill in the House.  Delegate Glenn agreed to cross-file the bill.

On February 13, 2019, LUCAS met Delegate Glenn at a restaurant in Annapolis, Maryland. Delegate Glenn told LUCAS she had received the "blue back" of the bill (House Bill 1315). A "blue back" is a term used in the Maryland General Assembly to refer to the original copy of a bill.  LUCAS told Delegate Glenn he would send an email to her account so that she would understand the purpose of the bill she had agreed to introduce.  LUCAS explained to Glenn that as a result of the bill, Company 1 would receive payments from institutions implementing the curriculum.  LUCAS agreed to pay Delegate Glenn an additional $1,500.  On that same day, LUCAS sent an email from his email account to Delegate Glenn's email account.  The email included a list of talking points regarding the cyber warrior bill that LUCAS had requested Delegate Glenn to cross-file and vote in favor of in the House.  LUCAS admits that this email was a wire transmission and traveled in interstate commerce.

11

On February 15, 2019, Glenn cross-filed House Bill 1315. The bill was assigned to the Rules Committee in the House because it was filed after the deadline for introducing such legislation.

On March 4, 2019, LUCAS met Delegate Glenn at a restaurant in Annapolis, Maryland. At LUCAS's request, Delegate Glenn agreed to talk to LUCAS in his Porsche instead of inside the restaurant. LUCAS provided Delegate Glenn with $1,500 in cash in a bank envelope. Delegate Glenn told LUCAS, "we got a slight problem . . . with the Rules Committee" because House Bill 1315 did not make the list to get voted out of the Rules Committee. Delegate Glenn told LUCAS that she knew a member of the Rules Committee ("Delegate 1") who could make sure that House Bill 1315 was voted out of the Rules Committee, but Delegate 1 wanted $1,000 for passing the bill. LUCAS agreed to pay Delegate 1 $1,000 through Delegate Glenn.

During this meeting, LUCAS also proposed to pay Delegate Glenn up to $80,000 for her assistance in securing a medical marijuana growing license for Company 3 because Company 3 wanted to ensure it would be selected during the "double-blind" application process before the Cannabis Commission. After discussing Company 3's application for a growing license, the following conversation occurred:

> LUCAS:     . . . look, I, I can't, I can't like risk it. I need to do this . . . how much would it take if it was twenty, if it was twenty, it was fifty, if it was eighty, um, I wanted to make sure that I partner with you, of course, on the low to, to um. . .
>
> Glenn:     Twenty, fifty or eighty what?
>
> LUCAS:     Thousand.
>
> Glenn:     To do what?
>
> LUCAS:     To help.

LUCAS concluded the meeting with Delegate Glenn by stating that, "resources is [sic] not an object for this" and "I need any advantage I can get." Delegate Glenn agreed to consider what could be done to give Company 3 an advantage during the "double-blind" application review process.

On March 7, 2019, Delegate Glenn sent LUCAS a text message which stated "I need the name of your [m]edical [m]arijuana company, and the names of everyone who are partners in the company. Working on a plan to help. By the way, I kept my word, the Cyber Security bill will be voted out of [the] Rules [Committee] tomorrow and re-[r]eferred to probably [the] Ways & Means [Committee]. See you Monday."

*The Fifth Payment - $1,000*

On Monday, March 11, 2019, LUCAS met Delegate Glenn in his Porsche in the parking lot of a restaurant in Annapolis, Maryland. Delegate Glenn told LUCAS that Delegate 1 on the Rules Committee "came through" and voted the bill out of committee. LUCAS handed Delegate Glenn $1,000 cash wrapped in white paper and stated "That's a thousand right there." LUCAS and Delegate Glenn agreed that Delegate Glenn would provide the $1,000 to Delegate 1 for voting House Bill 1315 out of the Rules Committee.

Furthermore, during this same meeting, Delegate Glenn told LUCAS that she might be able to do something to give Company 3 an advantage in its pursuit of a medical marijuana growing license. Delegate Glenn said she was concerned about receiving a large amount of money in one payment. LUCAS advised that he could provide Delegate Glenn with smaller amounts of cash such as $10,000 over the course of several separate payments. LUCAS said that money was not an issue because he was working with "billionaires" at Company 3. LUCAS explained that he had turned his phone off while meeting with Delegate Glenn so that there was no risk of being recorded by law enforcement.

On March 18, 2019, LUCAS sent a text message to Delegate Glenn which stated "…just want to see if you heard anything at all about hb1315." LUCAS used an interstate facility in connection with sending this text message.

On March 25, 2019, Delegate Glenn met LUCAS in his Porsche in the parking lot of a restaurant in Annapolis, Maryland. Delegate Glenn told LUCAS, "I got a guy on the inside of the Commission [Cannabis Commission Employee 1] that's gonna give your company [Company 3] an advantage during the application process." Delegate Glenn told LUCAS that she needed to know the names of the individuals who were on the application so that it could be pulled and selected as one of the applicants to receive a medical marijuana growing license during the "double-blind" review process.

Delegate Glenn said she was "nervous" and "[she] could get in a lot of trouble" for helping LUCAS. LUCAS responded, "I'm from Baltimore for real, for real Baltimore…This is the least illegal thing that I've ever done. This is like patty-cake compared to the shit in Baltimore City." LUCAS further explained that he was dealing with powerful people who had access to billions of dollars, and assured Delegate Glenn that everything would be ok. The following exchange then occurred:

| | |
|---|---|
| LUCAS: | What I need before, if you got a guy, I need his number. |
| Glenn: | I can't give you his number. |
| LUCAS: | Not his [phone] number. His number. |
| Glenn: | Oh, oh, oh, the money. |

13

| LUCAS: | You know what I'm sayin'? Yes. |
|---|---|
| Glenn: | The money. |
| LUCAS: | I don't want his name. |
| Glenn: | Uh huh. |
| LUCAS: | I don't want his [phone] number.  I don't wanna know… |
| Glenn: | Uh huh. |
| LUCAS: | …what color he is.  I don't even know, want to know it's a him.  He's a her to me. |
| Glenn: | Yeah.  Yeah.  Yeah. |
| LUCAS: | I don't give a shit. |
| Glenn: | Yeah. |
| LUCAS: | I believe exactly what you say. |
| Glenn: | Well… |
| LUCAS: | But we need to find out what his number is. |
| Glenn: | I, I had talked to him about fifty thousand dollars. |
| LUCAS: | Okay, cool.  That's fine. |

LUCAS told Delegate Glenn to think about how much money she wanted for her role in the scheme and for helping Company 3 gain an advantage in the application process. Delegate Glenn told LUCAS that she could get in "big time trouble." LUCAS told Delegate Glenn that he would not say anything and he was "like 007 about this shit." LUCAS told Delegate Glenn he needed to know how much money Delegate Glenn wanted because LUCAS wanted to get the money for her and Cannabis Commission Employee 1 at the same time. LUCAS asked Delegate Glenn to determine her "number" within the next twenty-four hours, but cautioned her to use coded language when telling LUCAS over the phone about the amount of money she wanted for facilitating the bribe payments.

On March 27, 2019, Delegate Glenn sent a text message to LUCAS which stated "Getting ready to buy lottery tickets, 20 should get me a winner." The text message was code for telling LUCAS that Delegate Glenn wanted $20,000 for her role in the scheme and for helping Company 3 gain an advantage in the "double-blind" application review process.

14

*The Sixth Payment - $1,000*

On April 4, 2019, Delegate Glenn and LUCAS met in the parking lot of a restaurant in Annapolis, Maryland.   LUCAS provided Delegate Glenn with information that Cannabis Commission Employee 1 could use to identify Company 3's application for a growing license during the "double-blind" review process. LUCAS told Delegate Glenn that his business partners at Company 3 had agreed to pay Cannabis Commission Employee 1 $50,000, but they wanted to it in two payments, $25,000 now and $25,000 after the license was awarded. Delegate Glenn asked who was providing money, and LUCAS said "it's the whole entire team."   Delegate Glenn explained that Delegate Glenn and Cannabis Commission Employee 1 were "steppin' out there" and taking a risk by taking money in exchange for ensuring that Company 3's application would be picked. LUCAS tried to assure Delegate Glenn that she should accept the money by comparing the payments to other convicted politicians, including former Mayor Catherine Pugh, who LUCAS said received "a half million dollars for a damn book," and  former Senator Nathaniel Oaks who LUCAS said was only caught because he did not know the "mother fuckers" who paid him bribes. LUCAS further explained that although "eighty percent of the people on the [Cannabis] Commission already know [two of LUCAS' business partners] . . . My thing is, I don't leave nothin' to fuckin' chance… Nothin' to chance. We need to get this." LUCAS provided Delegate Glenn with $1,000 cash in a bank envelope, which he called a down payment for Cannabis Commission Employee 1.   LUCAS and Delegate Glenn agreed that LUCAS would provide additional payments totaling $49,000 for Delegate Glenn to provide to Cannabis Commission Employee 1, and LUCAS agreed to pay Delegate Glenn $20,000 over four installments for her part in the bribe scheme.

*The Seventh Payment - $8,000*

On April 12, 2019, Delegate Glenn met LUCAS in his Porsche at a store parking lot in Baltimore, Maryland.   LUCAS provided Delegate Glenn with $8,000 in cash in an envelope to give to Cannabis Commission Employee 1.  LUCAS thanked Delegate Glenn for her help with House Bill 1315.  LUCAS mentioned that House Bill 1315 was partially "gutted," but that he would rather have a "gutted" bill than a "killed" bill.  LUCAS was referencing the House amendment to the bill that removed the provision requiring the award of contracts to only certain businesses that met specified criteria.

*The Eighth Payment - $13,800*

On May 23, 2019, Delegate Glenn met LUCAS in his Porsche in a restaurant parking lot in Baltimore County, Maryland.  LUCAS provided Delegate Glenn with $13,800 in cash, which he said was $14,000, for Cannabis Commission Employee 1.  LUCAS provided the official legal name for Company 3, which had recently been incorporated in the state of Maryland.  LUCAS provided additional information about Company 3's application that could be ascertained by reviewing a redacted application during the Cannabis Commission's "double-blind" review process.  In other words, LUCAS told Delegate Glenn what Cannabis Commission Employee 1 should look for in the redacted applications to locate Company 3 and ensure that Company 3 be selected to receive a medical marijuana growing license.

On May 24, 2019, Delegate Glenn called LUCAS to tell him that he was $200 short on the May 23rd payment, and LUCAS agreed to make up for it on the next payment. LUCAS confirmed that Company 3 had submitted its application for a medical marijuana growing license and said,"[w]e good to go."

*The Ninth Payment - $6,200*

On May 29, 2019, Delegate Glenn met LUCAS in his Porsche at a restaurant parking lot in Baltimore County, Maryland. LUCAS provided Delegate Glenn with $6,200 cash in a black plastic bag. LUCAS instructed Delegate Glenn that $2,200 was for Cannabis Commission Employee 1 and $4,000 was for Delegate Glenn. LUCAS also provided additional information about how to identify Company 3's application by looking for unredacted references to Non-Profit 1 in a portion of Company 3's application for a medical marijuana growing license. Delegate Glenn asked LUCAS if the rest of the money would be available once Cannabis Commission Employee 1 made sure that a growing license was awarded to Company 3, and LUCAS responded, "Hell yea. No, that's instant."

*The Tenth Payment - $5,400*

On June 27, 2019, Delegate Glenn met LUCAS in a rented Mercedes in a restaurant parking lot in Baltimore County, Maryland. LUCAS provided Delegate Glenn with $5,400 in cash in a brown paper bag, as further payment for her part of the bribe scheme.

On July 11, 2019, during a phone call, LUCAS asked Delegate Glenn about the status of the medical marijuana growing license awards. Delegate Glenn said the Cannabis Commission had delayed the award of licenses, but that LUCAS should not worry because Company 3 was set to receive one of the medical marijuana growing licenses.

*The Eleventh Payment - $1,100*

On July 30, 2019, Delegate Glenn met LUCAS in the parking lot behind a restaurant in Baltimore County, Maryland. During the meeting, LUCAS provided Delegate Glenn with $1,100 in cash for her role in the scheme and for facilitating payments to Cannabis Commission Employee 1 in exchange for the award of a growing license to Company 3.

*Overall*

In sum, LUCAS paid Delegate Glenn $42,500 in furtherance of the scheme and artifice to defraud and deprive the citizens of Maryland and the State of Maryland of the right to the honest services of Delegate Glenn, through bribery and the concealment of material information. LUCAS admits that he knowingly and willfully participated in the scheme and artifice to defraud as alleged in Count One of the Information. LUCAS admits that he had the specific intent to promote, manage, establish, or carry on or distribute the proceeds of an unlawful activity, to wit, state bribery in violation of Section 9-201(b) ("Bribing Public Employee"), Md. Crim. Law (formerly Art. 27, Section 22), as alleged in Count Two of the Information.

16

SO STIPULATED:

Derek E. Hines
Leo J. Wise
Assistant United States Attorneys

Lance Andre Lucas
Defendant

Jerry Tarud, Esq.
Counsel for Defendant

17